**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff,**

v.

**MISSOURI STATE HIGHWAY PATROL, et al., Defendants.**

**Calvin PRICE, Plaintiff,**

v.

**Alan S. WHITMER, et al., Defendants.**

**Nos. 82–4129–CV–C–5, 81–4135–CV–C–5.**

United States District Court,
W.D. Missouri, C.D.

Dec. 22, 1982.

Cynthia L. Schulte, E.E.O.C., St. Louis, Mo., Alex Bartlett, Jefferson City, Mo., for Calvin Price.

Michael Boicourt, Asst. Atty. Gen., Jefferson City, Mo., for Mo. State Highway Patrol, Alan S. Whitmer, et al.

## ORDER AND MEMORANDUM

SCOTT O. WRIGHT, District Judge.

This is a consolidated action brought by the Equal Employment Opportunity Commission ("EEOC") and Calvin Price, a lieutenant in the Missouri State Highway Patrol ("Patrol"), against all of the defendants under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, et seq. The EEOC challenges the defendants' maximum hiring age of 32 for troopers and radio operators and the defendants' mandatory retirement age of 60 for all uniformed members of the Patrol. Price challenges only the mandatory retirement age. A bench trial was conducted during the week of November 7, 1982. The parties have submitted exhaustive proposed findings of facts and conclusions of law, and excellent briefs. After a thorough review of the evidence introduced at trial and the parties' briefs, the Court finds, for the following reasons, that the mandatory retirement age of 60 for all uniformed members of the Patrol violates the ADEA, that the maximum hiring age of 32 for radio operators violates the ADEA, and that the maximum hiring age of 32 for troopers is valid.

## I. FINDINGS OF FACT

1. Plaintiff EEOC is an agency of the United States charged with the administration, interpretation and enforcement of the ADEA, and is expressly authorized to bring an age discrimination action. 29 U.S.C. § 626(b), as amended by Section 2 of the Reorganization Plan No. 1 of 1978, 92 Stat. 3781. Plaintiff Price is a lieutenant in the Missouri State Highway Patrol. Defendant Whitmer, at the time these lawsuits commenced, was the Superintendent of the Patrol. Since August 17, 1982, Howard J. Hoffman has been the Superintendent. Defendant Daniel is the Director of the Department of Public Safety of the State of Missouri. Defendant Missouri Highway and Transportation Commission is a governmental entity with a legal status separate from the State of Missouri and is responsible for the payment of salaries to the members of the Patrol. Defendant Bradford was the Commissioner of Administration of the State of Missouri at the time these lawsuits were filed. Since February 10, 1982, John Pelser has been the Commissioner. The State of Missouri and the Patrol have been employers within the meaning of 29 U.S.C. § 630(b) since May 1, 1974.

2. Price joined the Patrol on October 14, 1949. He was promoted to sergeant on June 1, 1962 and to lieutenant on August 1, 1975. On June 9, 1981, he attained the age of 60.

3. Price was advised on January 15, 1981 that if he wished to serve the Patrol beyond the age of 60 he was required to request an extension. He requested an extension on May 6, 1981, but was told by defendant Whitmer on May 18, 1981 that he must retire on July 1, 1981.

4. On June 29, 1981, Price filed an age discrimination charge with the EEOC. During July, 1981, he filed an age discrimination complaint in this Court and simultaneously moved for a temporary restraining order. An injunctive order was issued permitting Price to remain on the Patrol until his case was resolved. In the course of processing Price's charge, the EEOC discovered that the Patrol had a maximum hiring age of 32 for patrolmen and radio operators. The EEOC filed suit on July 7, 1982, challenging the mandatory retirement age and the maximum hiring age restrictions enforced by the Patrol.

A. Mandatory Retirement

5. Section 104.080 of the Revised Statutes of Missouri requires all uniformed members of the Patrol to retire at age 60. Prior to June, 1982, Section 104.080 required all uniformed members of the Patrol to retire at age 65 and vested the Superintendent of the Patrol with discretion to extend the employment of members of the Patrol whose ages fell between 55 and 65. Since 1945, the Patrol has adhered to a policy of mandatorily retiring all uniformed members at age 60 without regard to a member's health, job responsibilities or job performance. The Superintendent has routinely granted requests for extension to members of the Patrol whose ages fall between 55 and 60 even where those members had serious health problems which restricted their ability to participate in physically strenuous activities. Requests for extensions were only denied in cases where a member could not perform any job.

6. Since 1955, the Patrol has not allowed any uniformed member to remain employed past the age of 60 unless the Missouri legislature was currently considering legislation that would affect a member's retirement benefits. If the legislation became law, the member was permitted to remain on the Patrol past the age of 60 until the legislation took effect. The member was then immediately retired. Where the legislation failed to become law, the member was required to retire at the end of the month in which the legislature adjourned. The purpose of these extensions was solely to allow a Patrol member to obtain any retirement benefits adopted by the legislature. The mandatory retirement age is enforced because of the Patrol's pension plan and not because of an older person's inability to perform.

7. The Patrol's mandatory retirement policy applies equally to all ranks and job classifications. Since 1978, all members of the Patrol who were mandatorily retired held the rank of corporal or above. All but one held the rank of sergeant or above. All of the uniformed members who have been mandatorily retired at age 60 were rated by their superior officers as fully capable of performing all of the duties of their jobs. Price is able to fully perform his duties as a lieutenant in the Patrol. He is in excellent health and is under no restrictions with respect to the performance of his present Patrol duties.

8. All Patrol members must enforce the laws of Missouri when travelling to and from work, and while on duty in their Patrol cars. While not on duty, they must report crimes and must take appropriate action to prevent a felony in progress, or to prevent serious injury to a person or property. Most members are required to patrol the highways on Memorial Day, the Fourth of July and Labor Day. Some members are exempted for health reasons or for office work needed by the Patrol on those holidays.

9. As the rank of a Patrol member increases the frequency with which members are exposed to physically strenuous or dan-

gerous activities decreases. The Superintendent, and the majors, lieutenants and captains spend the overwhelming majority of their time performing administrative work. Desk sergeants, sergeants who supervise license examiners, and sergeants who supervise vehicle weight inspections spend most of their time performing administrative work. For example, in the first five months of 1982, lieutenants were responsible for only 10 out of 106,937 arrests, or .01%; they were responsible for 102 out of 273,098 arrests, or .04% in 1979; they were responsible for 32 out of 279,648 arrests, or .01% in 1980; and they were responsible for 64 of 287,524 arrests, or .02% in 1981. There may be as many as 46 lieutenants serving on the Patrol. The average captain makes only .04 arrests, .3 warnings and performs .5 service rendered calls per month. There may be as many as 20 captains serving on the Patrol. The Missouri Department of Corrections permits its prison guards to work beyond the age of 60. Guards past the age of 60 have successfully served on prison emergency squads which quell uprisings within the prison population.

10. Higher ranks are held by the older members of the Patrol. The average member of the Patrol who is between 55 and 59 years of age makes only 4 arrests per month. The average member of the Patrol who is between 20 and 29 years of age makes 40 arrests per month. From 1979 to the present, 67% of the total arrests were made by patrolmen or patrolmen first class, 19% were made by corporals, 13% were made by sergeants, and less than 1% were made by all lieutenants, captains, majors and the Superintendent.

11. The Patrol has no physical fitness program for members after they have graduated from the training academy. The Patrol does not regularly test its members to determine whether they are physically able to perform all of the tasks which might arise during the course of their employment. The Patrol has no weight restrictions. According to the desired weight tables published by the Metropolitan Life Insurance Company, at least 68% of the members of the Patrol are overweight. A greater percentage of members over the age of 40 are overweight than are members under the age of 40. There is no increase in the percentage of overweight members between age 40 and age 59. Sixty-two percent of the patrolmen, patrolmen first class, and corporals are overweight. At least one patrolman is 80 pounds overweight. There are one or more persons in the ranks of patrolman, patrolman first class, corporal, sergeant, lieutenant, and captain who are at least 36 pounds overweight. Physical fitness is not used as a criteria for promotion. A regular physical fitness program would save the Patrol money because sick leave and workmen's compensation claims would be reduced. Weight limitations were repealed by the Patrol because no one would enforce them. In the one year when physical exams were conducted, many of the patrolmen discovered health problems about which they were previously unaware.

12. A number of members of the Patrol have suffered heart attacks and have been permitted to return to their regular job duties. Every member of the Patrol who had a heart condition and who applied for an extension of employment between the ages of 55 and 60 was granted an extension. Sergeant J.T. Cassidy suffered a severe heart attack in 1978 and was permitted to return to his job as a zone sergeant. Cassidy's commanding officers reported that he was fully able to perform all the duties required of a sergeant or patrolman. Major Englehard, who has a heart condition, was found by his commanding officer to be able to perform the most physically demanding responsibilities of a major's duties. Captain Cassady, who suffers from arthritis and high blood pressure, was found by his commanding officers to be able to perform the duties of the Director of Construction and Maintenance. Captain Maddox, who has a heart condition, was found to be able to perform his duties as Bureau Director of the Criminal Division. The Patrol attempts to secure desk jobs for those members who develop health problems which interfere with their ability to perform. Sergeant

Malinowski, for example, was transferred from a zone sergeant position to a position as a Supervisor of Motor Vehicles after his second heart attack because the Supervisor job is physically less demanding.

13. The Patrol utilizes a vigorous selection process which measures the skills and abilities needed to perform the duties of a patrolman. A patrolman's level of skill and ability could be accurately ascertained through tests administered throughout a patrolman's career. A patrolman's maturity, judgment and ability to deal with people increases with age and experience. A patrolman is trained for approximately eleven years before being asked to serve the Patrol in an administrative capacity.

14. Age alone is not responsible for coronary artery disease and cannot determine a person's risk of a heart attack. There are wide variations in risk among individuals of the same age depending on systolic blood pressure, cholesterol levels and other measurable factors. Many older persons have a lower risk of heart attack than persons 20–30 years younger. Women have a significantly lower risk of a heart attack than men. Only .4% of the population develops symptoms of coronary artery disease by age 30, only 1% develops symptoms by age 50, and only 2% by age 60.

15. Physicians can determine with reasonable accuracy whether a patrolman can safely perform law enforcement duties. Physical abilities needed to perform the duties of a patrolman can be easily tested at any age without expensive or complicated equipment. When the Bruce Protocol is joined with a complete risk factor analysis, physicians can identify nearly every person who is likely to have a heart attack in the following few years. No member of the Patrol has ever had a heart attack while performing physically strenuous activities or encountering a psychologically stressful situation.

B. Maximum Hiring Age

16. Section 43.060 of the Revised Statutes of Missouri requires that patrolmen and radio operators of the Patrol not be over the age of 32 at the time they are hired. The Patrol has not hired any person who is over the age of 32 as a patrolman or radio operator since 1945. The Patrol does not allow persons who are age 33 or older to fill out an employment application for a patrolman or radio operator position or to participate in the Patrol's competitive selection process. Persons over the age of 40 are employed as patrolmen and radio operators and are satisfactorily performing their jobs.

17. Radio operators do not carry guns, make arrests, or participate in Patrol activities; they operate and repair radios. The mandatory retirement age for radio operators is 70. Radio operators are sometimes called upon to work long hours and to rotate shifts. The Patrol is able to test the hearing, eyesight and technical skills needed by radio operators. No physical fitness tests are administered to radio operators. The County of Phelps, Missouri has no maximum age for hiring radio operators and has hired an operator who was over 40 years of age.

18. The duties of the entry level job of patrolman involve physically strenuous, psychologically stressful and dangerous activities. Patrolmen unlike higher ranking members, routinely must be able to chase suspects on foot and in vehicles, assist at scenes of accidents, enforce traffic laws, and engage in criminal investigations. They must be mature, possess good judgment and be able to work well with people. They often work long hours and must rotate from day to night shifts.

19. It takes a Patrolman approximately five years to become a proficient road officer and another six years to acquire the experience to serve the Patrol in an administrative capacity.

C. Retired Patrol Members Seeking Monetary Relief

20. Major Francis Jones was over the age of 60 when he was mandatorily retired by the Patrol. He worked for the Patrol from November 26, 1951 to July 1, 1981. He was fully capable of performing his

duties at the time of his retirement and would have continued working. He was in good health at the time of his retirement and is in good health now. He was earning $29,998 per year at the time of his retirement. Had he continued working, he would have received a 10% wage increase in October, 1981. He presently receives a pension of $1,349.00 per month and received a 4% cost of living increase on October 1, 1982.

21. Captain Freddie H. Roam worked for the Patrol from July 1, 1946 until he was mandatorily retired in July, 1981. He was over 60 years old when he retired. Captain Roam had had a heart attack in 1967 and eventually returned to work. Shortly before his retirement, Captain Roam had a quadruple bypass surgery for his heart and within two months was healthier than he had been while working for the Patrol. He was fully capable of performing the duties of his job at the time of retirement and would have continued to work. He is presently more capable of performing his job than he was when he was working for the Patrol. At the time of his retirement he was earning $28,300.20 annually. His pension is currently $14,344.97 annually. He received a 4% cost of living increase on October 1, 1982.

22. Sergeant David Walker was over 60 years old when he was mandatorily retired from the Missouri State Highway Patrol. He had worked for the Patrol from July 1, 1946 to July 1, 1981. Walker was fully capable of performing all of his job duties as desk sergeant at the time of his retirement, and if permitted, would have worked to age 62. He was earning $2,300 per month at the time of his retirement and would have received a 10% longevity increase had he continued. He was in good health at the time he retired and is in good health now. He has held no jobs since his retirement from the Patrol but has been receiving a pension. The pension is presently $1,370 per month. He received a 4% cost of living increase on October 1, 1982 and a 5% cost of living increase on October 1, 1981.

23. Captain Norman E. Tinnin was mandatorily retired from the Missouri State Highway Patrol as of July 1, 1982. He had turned 60 on June 2, 1982. He was capable of performing his job at the time he retired and is still capable of doing so. At the time of his retirement he was earning $2,537.60 per month. He has no interim earnings. He is drawing a pension from the Patrol. At the time of his retirement he was given a final evaluation. He was rated excellent—the highest possible rating—in job knowledge, judgment, attitude, dependability, creativity, and personal efficiency, and ability to organize, to delegate authority and to deal with people.

24. Sergeant Lloyd Roberts worked for the Patrol for 28 years and 7 months. He retired on May 1, 1982 at age 55. He retired because he was informed that he would be transferred from zone sergeant to desk sergeant. His replacement as zone sergeant was 39 years old. Roberts testified that at the time of his retirement he was fully capable of performing his job. Colonel Hoffman testified that the Patrol had only 3 zone sergeants over the age of 55. Roberts enjoyed his job as zone sergeant and did not want to sit at a desk while he still enjoyed outdoor work. Were it not for the mandatory retirement at age of 60 and the Patrol's knowledge that Roberts would work only 5 more years, he would not have been transferred to desk duty. Roberts' last monthly salary prior to retirement was approximately $2,440. He has had earnings since his retirement of approximately $850 per month. His pension from the Patrol is $1,362.55 per month.

25. Lieutenant Colonel Ernest W. Van Winkle was mandatorily retired by the Patrol on July 1, 1980 at the age of 60. Lt. Colonel Van Winkle would have continued working for 2½ years if it had not been for the Patrol's mandatory retirement policy. He was in good health at the time of his retirement and was fully capable of performing all of the duties of his job of Assistant Superintendent. His salary at the time of retirement was $2,795.20 per month. Colonel Van Winkle's pension is currently $1,395.40 per month. He received one 4%

cost of living adjustment on October 1, 1982, and two 5% cost of living adjustments on October 1 of each of the two prior years. He does not have any interim earnings. He is still in good health and fully capable of performing the duties of his former job. He does not want his job back at this time.

26. Major Albert F. Closson was mandatorily retired by the Patrol on August 31, 1979 at the age of 60½. Major Closson would have continued working until he reached the age of 62 if it had not been for the Patrol's mandatory retirement policy. He was in good health and capable of performing all the duties of his job as Chief of Staff at the time of his retirement and at age 62. His salary at the time of retirement was $2,480 per month. His current pension is $1,400 per month. He received a 4% cost of living increase on October 1, 1982 and a 5% cost of living increase on October 1, 1981 and October 1, 1980. His interim earnings are $4,200 for the period August 31, 1979 to February 9, 1981.

27. Sergeant James W. Colvin was mandatorily retired on February 28, 1981 at the age of 60 and 2 months. Sergeant Colvin would have continued working until June 1, 1982 if he had been permitted to do so. He was in good health and fully capable of performing the duties of his job as a desk sergeant at the time he retired. His salary at the time of retirement was $2,136 per month. His pension for the period February 28, 1981 to June 1, 1982 was $823 per month. He has no interim earnings.

28. Sergeant Eugene D. Hancock was retired in September of 1981, four months prior to his 60th birthday because he was being transferred from his job as Supervisor of Vehicle Weight Inspectors to the job of desk sergeant and was being replaced by a younger person. At the time of his retirement, he was in good health and was fully capable of performing all of the duties of his job. He would have continued working up to the present time if he had not been transferred to the desk and if the Patrol did not have a mandatory retirement age of 60. His salary at the time of his retirement was $2,400 per month. He pres-

ently receives a pension. He received a 4% cost of living increase on October 1, 1982. He has no interim earnings. He does not want his job back at this time.

29. Lt. Richard Burnett retired on September 1, 1981, retired at age 59½ because he could get a 4% cost of living increase in his pension by retiring early and because he knew he was going to have to retire at age 60. Burnett would have continued working past the age of 60 if it had not been for the defendants' mandatory retirement policy. He was in good health and was fully capable of performing the duties of his job as operations lieutenant at the time he retired. Burnett is still in good health. His salary at the time of retirement was $28,000 per year. For the period September 1, 1981 to September 1, 1982, his pension was $1,260.50 per month. For the period September 1, 1982 to the present, his pension has been $1,379.23. Burnett has not had any interim earnings. He is still fully capable of performing the duties of operations lieutenant but he does not want his job back.

30. Sergeant James R. Hightower was mandatorily retired on July 1, 1979 at the age of 60 and 3 months. He would have continued working to age 62 if permitted to do so. He was in good health and fully capable of performing the duties of his job as Supervisor of Drivers License Examiners at the time of his retirement and at the age of 62. His salary at the time of his retirement was $2,160 per month. His pension at the present time is $970 per month. He received a 4% cost of living increase on October 1, 1982 and a 5% cost of living increase on October 1, 1980 and October 1, 1981. He had no interim earnings.

## II. CONCLUSIONS OF LAW

The ADEA, enacted in 1967, prohibits age discrimination against persons aged 40 through 60. Pub.L. No. 90–202, §§ 4, 12, 81 Stat. 602, 603, 607. It was amended in 1974 to apply to state and local governments. Pub.L. No. 93–259, § 28(a)(2), 88 Stat. 55, 74. The legislative history manifests a Congressional intent to require employment decisions to be made on the basis of ability

rather than age. 29 U.S.C. § 621(b). *See* H.R.Rep. No. 805, 90th Cong., 1st Sess.; S.Rep. No. 723, 90th Cong., 1st Sess. 1, U.S.Code Cong. & Admin.News 1967, p. 2213. The ADEA permits otherwise unlawful discrimination, however, where age is a bona fide occupational qualification ("BFOQ") reasonably necessary to the normal operation of the particular business. 29 U.S.C. § 623(f)(1).

The defendants have admitted that they will not hire persons over the age of 32 to be troopers or radio operators and will mandatorily retire patrolmen over the age of 60. These policies are *per se* violations of the ADEA. *EEOC v. City of St. Paul,* 671 F.2d 1162 (8th Cir.1982); *Houghton v. McDonnell Douglas Corp.,* 553 F.2d 561, 564 (8th Cir.), *cert. denied,* 434 U.S. 966, 98 S.Ct. 506, 54 L.Ed.2d 451 (1977); *Hoefelman v. Conservation Commission of Missouri Dept. of Conservation,* 541 F.Supp. 272, 274 (W.D. Mo.1982). Since a *per se* violation is admitted, the defendants must demonstrate that the arbitrary age restrictions are BFOQs which are reasonably necessary to the normal operation of the Patrol.

In order to establish a BFOQ, the defendants must establish a factual basis for believing either (1) that substantially all of the patrolmen over age 60 and substantially all applicants for trooper and radio operator positions over age 40 are unable to perform their duties safely and efficiently, or (2) that some older patrolmen or applicants possess traits precluding safe and efficient job performance unascertainable other than through knowledge of the patrolmen's or applicants' ages. *EEOC v. City of St. Paul, supra,* at 1166. The defendants contend that their proof satisfies either prong when applied to their minimum hiring age and mandatory retirement age rules. They additionally contend that the age restrictions are proper because they protect the Patrol's lucrative retirement benefits, promote morale and ensure advancement opportunities.

### A. *Mandatory Retirement Rule.*

■ The defendants have failed to prove that their mandatory retirement age of 60 is a BFOQ for members of the Patrol. Their evidence does not show that substantially all persons over age 60 are unable to safely and efficiently perform the duties of a patrolman, or that some persons over age 60 possess traits precluding safe and efficient performance unascertainable other than through knowledge of the patrolman's age. The testimony of their experts was not persuasive and was often contradictory.

The physiologist who testified for the defendants stated that aerobic capacity (the ability to use oxygen) is needed by members of the Patrol and decreases with age. According to the physiologist, an average 45-year-old adult male who is sedentary does not have sufficient aerobic capacity to perform the duties of the Patrol. Though the physiologist's conclusion is overly generalized and was not factually based on the duties of patrolmen, the Patrol does not even heed its expert's advice. The Patrol has routinely and successfully allowed patrolmen to work up to the age of 60. Members of the Patrol are not taken off road duty at age 45. And though all of the factors about which the physiologist testified—aerobic capacity, adaptability to heat, strength, endurance, vision and hearing—can be tested, the Patrol has not undertaken to measure the abilities of its members with respect to those factors.

The defendant's expert cardiologist testified that the risk of coronary artery disease increases with age. The increase in risk is minimal and is present for members of the Patrol whose ages are in their 30's. The risk peaks for those who are in their 50's at a rate of one percent. The genuineness of the Patrol's concern about the increased risk of coronary heart disease is questionable, however, since the Patrol has placed members who have had heart attacks in road-working jobs and has not exempted older members of the Patrol from road work.

Given the wide variations in risks among people of the same age and between men and women, age alone is a poor predictor of coronary artery disease. The risk of having a heart attack is better predicted when

additional indicators such as aerobic capacity, blood pressure, and obesity are known. The Patrol, however, does not require its members to undergo regular physical examinations and has not attempted to test its members in accordance with the advice of its own experts.[1]

The rebuttal evidence offered by the EEOC established that persons who are 60 years of age or older can perform the duties of the Patrol and that age alone is a poor predictor of a person's ability to perform safely and efficiently. The EEOC's medical expert stated that three elements must be present if a member of the Patrol is to be expected to perform well. A member of the Patrol must be free from impairing diseases, be able to perform and be motivated to perform. Because of the advances in the medical knowledge concerning the normal aging process, a distinction can be drawn between physical changes which can be associated solely with the aging process and those which are associated with disease and self-abuse. Physicians are able to determine with reasonable accuracy whether a member of the Patrol is able to perform his or her duties.[2] A patrolman's functional age, rather than chronological age, is a better determinant of his or her ability to perform. Two patrolmen of the same chronological age can have a widely divergent functional age, and thus a widely divergent ability to perform, if one is diseased or self-abused while the other is neither.

The physical abilities needed to perform law enforcement duties are easily tested. The EEOC's expert exercise physiologist demonstrated many simple and inexpensive tests which can quickly assess a patrolman's balance, flexibility, agility, speed, power and endurance. If the Patrol is genuinely concerned about the well-being of the public and its officers, it can readily evaluate its members and discharge those who cannot perform up to standard.

The defendants' claim that the mandatory retirement age must remain in effect to protect the Patrol's lucrative retirement benefits is not a proper defense and is based wholly on speculation. While it is true that the Patrol's retirement benefits are much better than those of other state employees, and that other state employees would like to be awarded similar benefits, there was no evidence which showed that those benefits would be curtailed if the mandatory retirement age of 60 was overturned. There was no evidence that the State of Missouri would not continue to reward the members of the Patrol for their service. In fact, the benefits can presently be withdrawn from the Patrol at any time. The problem of retirement benefits is a political question which the Patrol will be free to address in another forum.

Similarly, the defendants' claim that the mandatory retirement age promotes morale and ensures opportunities for advancement

1. The defendants also offered expert testimony from a local internist. The internist's testimony was extremely self-serving, since many patrolmen are his personal patients, and was not based on any recent scholarship. This Court has given it little credence.

2. The expert who offered this testimony, Dr. Stanley R. Mohler, testified by way of deposition in another age discrimination case ruled by this Court. *See Hoefelman v. Conservation Comm'n of Missouri Dept. of Conservation*, 541 F.Supp. 272, 273 n. 1 (W.D.Mo.1982). In *Hoefelman*, this Court credited another expert. The *Hoefelman* case is distinguishable on several grounds. First, Dr. Mohler's deposition testimony was incomplete. No studies were cited or discussed in the deposition. The plaintiff in *Hoefelman* did not go to the expense of calling Dr. Mohler as an expert so that he

might elaborate on his brief deposition testimony. His live testimony in the case-at-bar was extremely enlightening and persuasive.

Second, Mr. Hoefelman had not been forced to retire. He was merely transferred within the Department of Conservation. By his own admission, he stated that he should not engage in low-level flying beyond the age of 60 because of slowed reaction time and increased fatigue. *Id.* at 273. He was bound by his own admission.

Finally, the Court observed in *Hoefelman* that it was not closing its doors to new knowledge. *Id.* at 275. The Court must decide age discrimination cases based on the facts which are presented to it. In the case-at-bar, the defendants simply failed to carry their burden of persuasion on their BFOQ defense.

is without merit. The Patrol claims that a regular physical fitness program would hurt morale; yet the Patrol claims that its members must be physically fit in order to protect the public. If the Court accepts the Patrol's reasoning, it must conclude that the public is best served when the Patrol's morale is lowest. Members of the Patrol begin their careers highly motivated and in excellent physical shape. The academy training fosters high morale. It is within the capacity of the Patrol to keep morale high by maintaining the successful training programs throughout a patrolman's career. The Patrol is able to control the level of its morale. If the Patrol retires those who are no longer fit to serve the public at the age they become unfit, advancement opportunities will arise.

## B. *Maximum Hiring Age*

### 1. Radio Operators.

■ The defendants failed to prove that their maximum hiring age of 32 is a BFOQ for radio operators. They did not show that substantially all persons over age 40 are unable to safely and efficiently perform the duties of a radio operator or that some persons over the age of 40 possess traits precluding safe and efficient performance unascertainable other than through knowledge of that person's age. The duties of radio operators include repairing and installing equipment, hearing and transmitting information, typing, and, in some instances, climbing radio towers. The Patrol presently employs persons over the age of 40 who capably perform all of these duties. The Director of Radio Operations for the Patrol testified that persons over the age of 40 are able to master the skills necessary to perform the radio operator duties.

Section 43.060 of the Revised Statutes of Missouri, which requires the Patrol to turn away applicants who are over the age of 32, does not make any exceptions for persons who may have many years of radio operator experience. For example, a 33-year-old person with 13 years of experience with another state highway patrol cannot be considered for the radio operator's position.

Though the defendants suggested that hearing and vision generally decline with age, they offered no medical evidence which showed when the decline occurs. All of the traits which a radio operator must possess can be readily tested by the Patrol. The Patrol periodically tests the ability of radio operators to hear, see and master technical skills. The Patrol can easily base decisions to hire radio operators on these criteria since the tests have been developed and are presently in use.

### 2. Troopers.

■ The defendants have proved that their maximum hiring age of 32 is a BFOQ for troopers. The troopers spend almost all of their time doing road work. Though the Patrol requires all of its members to be able to perform all the strenuous physical activities which a trooper encounters daily, the evidence clearly demonstrated that the higher ranking members of the Patrol spend almost all of their time doing administrative work.

The safest patrolman is one who has acquired several years of experience. An experienced patrolman is best able to protect the public and serve as an administrator. It takes approximately eleven years for a trooper to gain sufficient experience to serve the Patrol in an administrative capacity. Thus, the maximum hiring age requirement of 32 for troopers is a BFOQ. *Murnane v. American Airlines, Inc.,* 667 F.2d 98 (D.C.Cir.1981), *cert. denied,* 456 U.S. 915, 102 S.Ct. 1770, 72 L.Ed.2d 174 (1982).

## III. RELIEF

Several former members of the Patrol testified that they would have remained on the Patrol if they had not been forced to retire, but that they do not want to be reinstated. The parties agreed not to undertake the computation of the monetary damages of these retired members of the Patrol until after the resolution of the liability issues. The parties should, therefore, submit their respective calculations with regard to the proper measure of damages.

IV.

Accordingly, it is hereby

ORDERED that judgment be entered in favor of plaintiff Price and that the defendants bear the costs of Price's action. It is further

ORDERED that judgment be entered in favor of the EEOC on the maximum hiring age claim of radio operators and mandatory retirement age claim and in favor of the defendants on the maximum hiring age claim of troopers. Defendants should bear two-thirds of the costs of the EEOC action. The EEOC should bear one-third. It is further

ORDERED that the parties separately submit their respective calculations on the proper measure of damages to be awarded to retired members of the Patrol who claimed damages within twenty (20) days of the date of this order. It is further

ORDERED that plaintiffs submit their claims for attorneys' fees within twenty (20) days of the date of this order.