**EQUAL EMPLOYMENT OPPORTUNI-
TY COMMISSION, Plaintiff,**

**v.**

**The MISSISSIPPI STATE TAX
COMMISSION and State of
Mississippi, Defendants.**

**Civ. A. No. J83-0717(W).**

United States District Court,
S.D. Mississippi,
Jackson Division.

July 10, 1987.

---

Jerome Rose, G. William Davenport, E.E. O.C., Birmingham, Ala., Gerald D. Letwin, E.E.O.C., Washington, D.C., for plaintiff.

John T. Kitchens, Asst. Atty. Gen., Bobby R. Long, Miss. State Tax Com'n, Jackson, Miss., for defendants.

## MEMORANDUM OPINION AND ORDER

WINGATE, District Judge.

### Statement of the Case

This cause came on to be heard before this Court, sitting without a jury, pursuant to this cause of action filed by the Equal Employment Opportunity Commission (hereinafter EEOC) as the federal agency responsible for enforcement of the Age Discrimination in Employment Act (hereinafter ADEA) pursuant to 29 U.S.C. § 626(b). The initial complaint alleged that the Mississippi State Tax Commission (hereinafter MSTC) had willfully violated 29 U.S.C. § 623(a) of the ADEA by involuntarily retiring employees who were at least 65 years of age at the time, but less than 70 years old. EEOC later supplemented this complaint, added the State of Mississippi as a party defendant, and asserted further violations by the MSTC in forcing the retirement of law enforcement personnel at age 62 or above on July 1, 1985, and at age 60 or above on July 1, 1986. These mandatory retirement ages (challenged as violative of ADEA by EEOC) are set forth at Miss.Code Ann. § 27–5–75 (Supp.1986). Both MSTC and the State of Mississippi are employers as provided under 29 U.S.C. § 630(b). EEOC seeks injunctive relief, reinstatement and back pay on behalf of those employees of the MSTC affected by the mandatory retirement policy set forth by the aforesaid statute. Jurisdiction of this matter is invoked pursuant to 29 U.S. C. §§ 216(c), 217 and 626(b), as well as 28 U.S.C. §§ 1331, 1337, and 1345.

### FACTS

The MSTC is the agency of the State of Mississippi responsible for most aspects of revenue collection. Prior to July 1, 1980, highway use taxes and fines levied on account of improper commercial use of Mississippi highways were the responsibility of the Mississippi Vehicle Comptroller's Office (hereinafter MVCO). On the aforesaid date, the functions of the MVCO ceased, that agency having been legislatively abolished. Responsibility for the enforcement of Mississippi's laws regulating maximum weight of commercial vehicles and collection of commercial use revenues was legislatively passed to the MSTC.

The Chairman of MSTC at the time the MVCO was abolished was A.C. Lambert, Sr. Lambert determined that extraordinary measures would have to be taken to improve the enforcement arm of the former MVCO. Testimony contended that the MVCO had been abolished due to lack of management, policital cronyism, and, generally, inefficient enforcement of the law. Lambert called upon the experience and resourcefulness of a career law enforce-

ment officer, Wood Stringer, to make recommendations for the contemplated needed reorganization. Lambert and Stringer agreed that the positions requiring closest scrutiny were those inspection station employee positions referred to as Revenue Inspectors or Field Inspectors.

Stringer became Administrative Assistant to Lambert and set out to conduct a thorough investigation and analysis of the positions in question. He found that these positions had been used to repay political obligations, often without regard to experience, age, or physical capability. Though some hired persons had a law enforcement background, this was the exception rather than the rule.

Under MVCO, many of the persons hired simply did not do the job. Although the statutes permitted the officers to carry weapons, no one was required to carry or qualify with a weapon. MVCO provided no uniforms for officers, no vehicles, and nothing to visually identify them as officers. Pursuit and patrol duties were carried out in personal vehicles, if at all. Morale was very low.

Stringer recognized that if the deplorable circumstances confronting the MSTC were to be improved, a radical change in image for these employees would be required. He recommended uniforms, vehicles, and safety equipment. Additionally, Stringer recommended that all officers be required to apply for MSTC law enforcement positions through the State Personnel Board and to complete Law Enforcement Academy training. The ultimate goal envisioned by Stringer was to have a specialized Law Enforcement Division of the MSTC similar to the Mississippi Highway Patrol (state troopers). He also recommended a mandatory retirement age of 55 years, the same as the one pertaining to state troopers. Chairman Lambert approved all of Stringer's recommendations except for mandatory retirement at age 55. Instead, Lambert felt that retirement age should be established at age 65.

Stringer's analysis of the Revenue Inspector positions led him to the conclusion that they should be categorized into pri-mary, secondary, and supervisory levels, similar to the organizational structure of the Mississippi Highway Patrol or State Troopers. The positions denominated were Scales Enforcement Officer I, Scales Enforcement Officer II, and Scales Enforcement Officer Supervisor, also referred to as Lieutenant. Under Stringer's proposed scheme, these officers were to be responsible for enforcement of all laws listed at Miss.Code Ann. § 27–5–71 (1972). This would include those laws pertaining to registration, licensing, and taxation of commercial trucks using the state's highways; their size, weight, and other load limits. Stringer also felt that when a driver of these type vehicles resisted or attempted to flee, the officers were to chase or subdue and arrest the suspected violator. Additionally, Stringer opined that MSTC officers should also be empowered to search commercial trucks for contraband. Stringer envisioned that pursuant to appropriate legislation and internal policy changes, eventually MSTC law enforcement officers were to assume duties not unlike those of the highway patrol or state troopers. All these recommendations for the Law Enforcement Division of the MSTC came to pass. *See,* Miss.Code Ann. § 27–5–73 (Supp.1986), placing responsibility for inspection stations upon the State Tax Commission, effective November 1, 1981; Miss. Code Ann. § 63–5–1, *et seq.,* (1972, as amended), including law enforcement officers of the State Tax Commission in the enforcement of these laws and contraband searches.

In 1985, the Mississippi Legislature, pursuant to a study commissioned to look into the relationship between aging factors and the job demands of Scales Enforcement Officers, amended Miss.Code Ann. § 27–5–75 (Supp.1986) to provide for mandatory retirement of those officers attaining the age of 62 years on or before June 30, 1986. Thereafter, retirement at age 60 years would be required.

### THE DUTIES OF THE POSITIONS IN QUESTION

The position of Scales Enforcement Officer I is also referred to as the stationary

scales officer. The incumbent weighs commercial cargo trucks from within a station scalehouse using automatic or manually operated scales for that purpose. The volume of traffic varies, depending upon location. The officer also checks the vehicles for proper decals and tags in order to determine whether there has been a proper tax appropriation.

In the event a truck driver behaves in a suspicious manner, it would be the officer's duty to detain the vehicle and investigate the matter giving rise to the suspicion. If a driver were to resist, or if a law violation were detected, arrest would become necessary.

Major Willie Richardson, director of the MSTC Law Enforcement Division, states that confrontations between truck drivers and stationary scales officers have been common. Some of these confrontations have required physical wrestling and grappling. Richardson described one situation in particular which was defused solely on account of the young officer's physical capability and determination.

The position of Scales Enforcement Officer II is also referred to as a portable scales officer. The incumbent patrols the highways and roads of the state seeking out those vehicles which are in violation of either the weight or tax laws. The vehicles they drive are law enforcement vehicles, duly marked with the proper decals, and equipped with the standard blue light found on state law enforcement vehicles.

Portable scales officers lift and manipulate the portable scales apparatus used to weigh commercial trucks encountered on the highway. In these circumstances, the trucks are detained and weighed on the spot, rather than escorted to a weigh station. Depending upon the type of equipment, the officer may be required to lift from forty to almost one hundred pounds of scales out of the trunk of a car, place them on the ground, then return them to the trunk of the car several times per day.

Another dangerous and frequent requirement of both the stationary and portable scales officers is the pursuit of fleeing violators or violators who "run the scales."

(This is vernacular for those trucks that refuse to stop and be weighed at a stationary scale). Major Richardson, Lt. Carl Walley, a 13 year veteran of the division, and several other witnesses gave account of high speed pursuits often at speeds of 80 to 90 miles per hour. Accidents and injury were shown to have occurred on the occasions when officers pursued violators.

Scales Enforcement Officers are often subjected to abusive language and threats of violence, as well as physical attacks. Officers testified that they were attacked and beaten, and, on at least one occasion, kidnapped by a person or persons intent upon violation of the law. While the majority of the officers who testified agreed that most situations were routine and uneventful, they agreed that their jobs presented a certain element of impending danger, especially when their duties were vigorously pursued.

Finally, the supervisory position of Lieutenant requires that the incumbent be able to perform all duties performed by those he supervises. All are required to perform all aspects of every job, regardless of current assignment. As pointed out by Major Richardson, it is absolutely necessary that everyone be able to perform all aspects of the various positions in order to have an efficient operation.

## THE LAW ENFORCEMENT DIVISION'S ROLE IN PUBLIC SAFETY

Dr. Charles Marx became the Chairman of MSTC on February 1, 1985, following the death of Chairman Lambert. He felt that significant progress had been made toward implementation of the new standards, but acknowledged that stagnating influences yet existed. Specifically, Marx was concerned with the qualifications of persons still retained by MSTC who had been employed under the policies of the MVCO. Under Marx, newly-hired officers were trained by the Law Enforcement Training Academy with required weapons qualifications every six months.

Marx described the officer's role in public safety as protecting the surface of the state's highways from undue wear, tear and damage which would result from their being subjected to overweight commercial trucks. Public safety was directly impacted by the presence of law enforcement vehicles now furnished by MSTC and their use in high speed pursuit. Now that weapons were required rather than simply permitted, public safety would be impacted by an officer's decision to use his weapon in certain circumstances.

Marx stated that MSTC officers were required to assist other law enforcement agencies of the state when called upon to do so. In times of natural disaster or other crises, MSTC officers would aid in evacuation, traffic control, guarding property from looters, and other duties as may be required.

Although Scales Enforcement Officers have no jurisdiction outside the State of Mississippi, Marx still expects them to pursue violators across state lines in order to obtain license numbers.

It was shown that the duties performed by Scales Enforcement Officers were stressful both physically and emotionally, requiring long work hours in all types of weather conditions.

The MSTC conceded that several goals in the transformation from tax collection agency to law enforcement agency have not yet been realized. Where vehicles have not yet been made available due to lack of funding, the MSTC still promotes the policy of using privately owned vehicles to pursue violators based upon the officer's discretion and assessment of the particular circumstances.

Dr. Marx acknowledged that several inherited employees of the MVCO who could not meet the physical standards required of a newly hired officer at the Law Enforcement Training Academy are still employed by the MSTC. Marx dismissed the possibility of firing these persons on this ground due to procedures for dismissal promulgated by the State Personnel Board which were both lengthy and costly. Marx felt that these proceedings would be too taxing on the limited resources of an already struggling new agency division.

Despite lack of funding and other obstacles, the MSTC witnesses indicated significant improvement in morale and in professionalism since the days of the MVCO. Several EEOC witnesses echoed the same sentiments.

## EEOC'S WITNESSES

Lt. Ray Ladner testified on behalf of EEOC pursuant to a subpoena. He acknowledged that the MSTC had made significant improvements and that officers had a disciplined, professional appearance. Prior to the MSTC take-over, Ladner described the revenue inspector's job as "purely political." Ladner stated that he would not want the situation to return to the way it was under the auspices of the MVCO.

It was Ladner's impression that the vehicles now being furnished to Scales Enforcement Officers were for purposes other than pursuit of violators. However, he acknowledged that MSTC policy letters contradicted his impressions. Ladner also acknowledged that he had given satisfactory performance ratings to officers he described under oath as lazy or prone to make too many errors.

Officer Frank Graham, who would retire pursuant to MSTC's mandatory retirement statute on June 19, 1987, testified that commercial truck drivers regarded him with greater respect since the MSTC had taken over the responsibility for state weight law enforcement. There was also a greater sense of pride among the officers which they did not have under the MVCO.

Much of Graham's testimony regading the requirements of his job dealt with practices and policy under MVCO. He stated that few officers carried a sidearm, but he acknowledged that a sidearm was now required by MSTC policy and that weapons qualification was conducted twice per year. Though Graham attempted to give the impression that he did not carry his own weapon on his person, he admitted that his pistol and holster had caused a raw irrita-

tion on his side and that he had overcome this problem by moving the holster one notch back on his belt.

Graham stated that his job offered no real danger and that the work pace was slow. Graham clarified this statement when he acknowledged that his place of employment was the scales at Lexie, Mississippi, a station not known for heavy traffic. Graham also stated that he never arrested any truck drivers and never engaged in pursuit of violators. In Graham's opinion, it was best not to argue or take issue with truck drivers complaining about tax payment. He added that most drivers did not refuse to pay, implying that there may have been some who did.

Mansel Earl Clayton, a retired military policeman, was hired by MVCO in 1978 at age 58. He was mandatorily retired from the MSTC on July 1, 1985. Clayton referred to the job of revenue inspector as a "cakewalk." Perhaps this is a response to be expected from one whose military law enforcement experience ranged from criminal investigation to security of nuclear storage facilities, but the job Clayton described at the Interstate 10 scales did not involve menial tasks. He testified that he encountered an overwhelming volume of traffic at his scales and that he had recorded the highest volume of tax collected for any inspection station in the state. (Clayton is one officer Lt. Ladner referred to as being prone to commit excessive errors in paperwork).

Clayton acknowledged that threatening situations convinced him to carry a blackjack, as well as his weapon. He related two instances where he had to use the blackjack or his pistol to subdue a violator. He told a story of uncooperative truck drivers, sometimes under the influence of drugs, and high speed pursuit of those who tried to "run the scales."

Clayton's testimony revealed that an officer's work is routine and often uneventful. However, his testimony made it clear that there were times when the officers would face situations, possibly life threatening, which would require a determined and pro-fessional response, even a violent response, in order to carry out the duties of the job.

Another retiree, Welton Ladner, testified that he was a revenue inspector, the title by which the positions in question were known when under the MVCO. Ladner described his work as uneventful. He never attempted to pursue violators due to his proximity to the Louisiana state line and his lack of jurisdiction once the line was crossed. Ladner was mandatorily retired on July 1, 1981, at age 66. At that time, according to Ladner, MSTC had not clarified its pursuit policy in regard to crossing state lines. Ladner only worked for one year under the MSTC. Most of the policies he described were those in effect under MVCO.

Although Ladner never chased a violator or attempted any vigorous enforcement of state law, he acknowledged that he still engaged in at least one altercation with a truck driver who would not purchase the proper revenue decal.

Three other officers, either retired or soon to be retired, appeared on behalf of EEOC. Their testimony was largely cumulative of that already recounted. Each officer or former officer described his duties as the job was performed under the auspices of the MVCO.

Officer Eido Depreo, who worked as a stationary scales and portable scales officer, testified that MSTC now furnished vehicles and a means of communication with other law enforcement agencies. Those had not been provided by MVCO. Depreo also acknowledged that he had engaged in high speed pursuit of violators since MSTC had taken over. He had never done so under MVCO. He now engaged in some physical training but had never done so under MVCO. Although Depreo stated that he had encountered no·serious incidents on the job, he considered himself lucky because he knew of others who had.

Depreo described attempts by commercial truck drivers to "run the scales." Time would pass with no such attempts, then two or three trucks would try to do so and require pursuit if a car was available. Depreo estimated that at least eight or ten

trucks per month attempted to race past the inspection station where he was assigned.

William Cliburn had 21 years of experience in law enforcement with the military prior to being employed by MVCO. He worked as a portable scales officer and described the duties of that position. The portable scales he handled were said to weigh between 50 and 60 pounds.

Cliburn testified that there was a noticeable, overall improvement when MSTC took over from MVCO. There was better organization, equipment, supplies arrived with regularity, and officers went for training at the Law Enforcement Training Academy.

Cliburn stated that he had chased trucks at speeds in the eighty miles per hour range, apprehended and weighed them. Otherwise, he had encountered no serious situations while in the performance of his duties.

Officer Joel Boyd worked with MVCO only one year before MSTC took over responsibility for this area of revenue collection. Boyd testified that he was told not to engage in pursuit of violators. He admitted that he had formed this impression when he received a letter from MSTC stating that he could no longer use his motorcycle to give chase to violators. The letter did not tell Boyd that he was not to pursue, only that he was not to use his motorcycle to do so.

Boyd testified that at least 20% of the trucks passing through an inspection station are not apportioned properly and that one learns with experience how to spot them. As a stationary scales officer, Boyd related incidents of non-cooperation by truck drivers not properly apportioned. On at least one occasion, a driver attempted to run over Boyd with his truck.

None of the witnesses appearing on behalf of EEOC felt his age had anything to do with his job performance. However, nearly all of them expressed a desire to work a few more years in order to increase their retirement benefits and stated that retirement benefits would be their sole source of income. All these witnesses had a vested interest in keeping their jobs as long as possible.

## EXPERT TESTIMONY

MSTC offered the testimony of three medical experts, Dr. Carl Paige, a general practitioner with experience in geriatric practice from Lubbock, Texas, Dr. Marcia Petrini, an exercise physiologist with the University of Mississippi Medical Center, and Dr. James Crosthwait, a cardiologist from Jackson, Mississippi.

Dr. Paige essentially testified that persons decline in their physical capacity after age 35. However, he agreed that physically active persons might maintain better health and fitness as they got older. Dr. Paige agreed with EEOC counsel that there existed medical problems with certain persons still employed by MSTC in the positions in question who had been hired by MVCO.

Dr. Petrini testified that aerobic capacity generally declines with age and explained how aerobic capacity was determined. It was her opinion that persons over 60 years of age were less likely to have the aerobic capacity necessary for critical aspects of the Scales Enforcement Officer position. Dr. Petrini agreed that regular exercise would increase one's aerobic capacity at least 10 to 20 percent.

Dr. Crosthwait discussed various forms of heart conditions which could exist in a person who displayed no symptoms. Although certain tests could be performed, false negatives often result, making the tests unreliable for any final determination of whether heart disease exists.

Dr. Crosthwait referred to the thallium stress test as being a very accurate method of detecting heart disease, but that this test involved a calculated risk of illness or death when performed. Even the thallium test would not reveal coronary artery disease. Further, the condition of coronary artery disease could manifest itself entirely within a six-month period after a negative test result and before the next annual medical examination.

It was Dr. Crosthwait's opinion that age was a condition which could not be avoided by exercise, and because of the effects on coronary health and the difficulty in detecting coronary disease, he would not recommend that persons over 60 years of age engage in occupations such as that of Scales Enforcement Officer.[1]

MSTC also relied on the study conducted by Dr. David Morris, an industrial psychologist with the firm of Morris & McDaniel in Jackson, Mississippi, as well as various other cities throughout the nation.

Dr. Morris testified that his firm conducted a study for the Mississippi State Personnel Board which involved 240 job titles. Among those were the Scales Enforcement Officer positions. He described how the study was conducted, then offered his conclusion that the positions proposed by the MSTC were law enforcement positions, occasionally involving confrontation with life threatening situations. Dr. Morris then concluded, as a developer of occupational tests, that no test could adequately measure reaction to life threatening situations.

EEOC presented Dr. Michael L. Pollock, director of exercise science at the University of Florida and a recognized expert in the field of exercise physiology, who has developed a program of physical fitness for law enforcement officers.

Dr. Pollock agreed that studies showed persons decreasing in aerobic capacity as they age, but that these studies did not take into account the effects a regular exercise program would have. Dr. Pollock concluded that lifestyle could offset the effect of aging and that regular exercise could improve the aerobic capacity of one 60 years or older dramatically.

Additionally presented were Dr. Arthur S. Leon, a cardiologist and epidemiologist, Dr. Joel Lefkowitz, professor of industrial psychology at Bernard Baruch College, City of New York University, David Couper, chief of police, Minneapolis, Minnesota, and Dr. Warner Schaie, director of the Gerontology Center at Penn State University.

All these experts generally concluded that aging was a matter of lifestyle and an individual process. Therefore, setting a mandatory retirement age of 60 years was arbitrary and did not take personal fitness into account. They also supported the conclusion that reaction time and fitness testing were at least reliable indicators of one's ability to perform most of the tasks in question.

## CONCLUSIONS OF LAW

### A. BFOQ Defense

Section 4(a) of the ADEA, 29 U.S.C. § 623(a), prohibits an employer from discriminating on the basis of age. The Act covers employment practices of state agencies, such as the defendants in this case. 29 U.S.C. § 630(d); *E.E.O.C. v. Wyoming*, 460 U.S. 226, 103 S.Ct. 1054, 75 L.Ed.2d 18 (1983). The State of Mississippi and the Mississippi State Tax Commission concede that the retirement statute distinguishes employees in the Scales Enforcement Officer's job class on the basis of age, *see*, Miss.Code Ann. § 27–5–75 (Supp.1986), but defend that policy as a bona fide occupational qualification (BFOQ).

Section 4(f) of the ADEA, 29 U.S.C. § 623(f), establishes this statutory exception:

> It shall not be unlawful for an employer ... to take any action otherwise prohibited under ... this section where age is a bona fide occupational qualification *reasonably necessary* to the normal operation of the particular business. [Emphasis Added].

The Fifth Circuit recognizes a two-prong legal test for determining whether an age classification qualifies as a BFOQ:

(1) The classification must be reasonably necessary to the essence of the employer's business; and

(2) The employer must have reasonable cause, that is a factual basis, for believing either that all of substantially all persons within the excluded class would

---

1. Dr. Crosthwait referred to Jim Fixx, the runner, who was in excellent physical condition, but still had heart disease and died of a sudden attack.

be unable to perform safely and efficiently the duties of the job, or that it would be impossible or impractical to deal with persons over the age limit on an individual basis. *Usery v. Tamiami Trail Tours, Inc.,* 531 F.2d 224 (5th Cir.1976). The burden of proof is on an employer to establish a BFOQ defense. In evaluating this proof, this Court, guided by sound principles of federalism, has granted some deference, although not determinative, to the state's legislative declaration. *E.E.O.C. v. City of St. Paul,* 671 F.2d 1162, 1167 (8th Cir.1982).

### B. Reasonably Necessary

 In applying the first part of the *Tamiami* test, the Court must be mindful of the safety aspect of the job. The Eighth Circuit Court of Appeals in the case of *Equal Employment Opportunity Commission and Calvin Price v. Missouri State Highway Patrol, et al.,* 748 F.2d 447, 450 (8th Cir.1984), cert. denied 474 U.S. 828, 106 S.Ct. 88, 88 L.Ed.2d 72 (1985), stated the following:

> We turn initially to the question of the mandatory retirement age for Patrol members. Although the District Court made several findings concerning the duties and qualifications of Patrol members, it did not directly discuss the first part of the *Tamiami* test set forth above. We discuss it here in order to clarify the demands that are placed on all Patrol members regardless of age or rank. The central concern of this part of the BFOQ test is illuminated by language from *Tamiami* in which the court, in sustaining as a BFOQ a bus company's maximum hiring age of forty for inter-city bus drivers, suggested that "[t]he greater the safety factor, measured by the likelihood of harm and the probable severity of that harm in case of an accident, the more stringent may be the job qualifications designed to insure safe driving." 531 F.2d at 236. *Employers are entitled to substantial discretion in judging the reasonableness of safety-related job qualifications. Id.* at 236 n. 30. [Emphasis Added].

The Eighth Circuit found that the Missouri State Highway Patrol's main functions are to enforce the traffic laws and to maintain safety on the highways. Based on testimony presented in the case *sub judice,* this is very similar to the functions performed by Scales Enforcement Officers. In addition, Mississippi statutes clearly charge Scales Enforcement personnel with the responsibility and duty to enforce state laws concerning the physical qualifications of highway vehicles and the nature and extent of cargo carried by such vehicles; laws concerning driver fitness; and laws concerning the inspection of such vehicles, drivers, and cargo. Miss.Code Ann. § 27–5–71 (Supp. 1986). In the performance of these duties, Scales Enforcement personnel are further directed by statute to wear uniforms and are authorized by statute to bear arms, make arrests, and impound vehicles operated in violation of the law. Miss.Code Ann. § 27–5–75 (Supp.1986). They are also charged with determining whether such vehicle is engaged in the illegal transportation of any contraband. Miss.Code Ann. § 63–5–49(3) (1972 as amended). Further, the Law Enforcement Division of the State Tax Commission has been designated by the State Board of Law Enforcement Officers Standards and Training as an agency subject to the provisions of the Mississippi Law Enforcement Officers Training Program. Miss.Code Ann. §§ 45–6–1, *et seq.,* (1972 as amended). Based on these statutes and the testimony of witnesses at trial, the defendants contend that the duties of Scales Enforcement Officers pertain to the essence of the business of the Mississippi State Tax Commission: the enforcement of the laws of the State.

In performing these law enforcement duties, Scales Enforcement Officers must accomplish several "critical tasks" according to the testimony of the defendants' experts who studied those jobs: pursuit driving (day and night); dealing with hostile and aggressive individuals; sometimes restraining truckers physically or by use of a firearm; and the daily tasks of observing trucks for violations or potential violations, sometimes under conditions of heavy workload. All of the defendants' witnesses,

both the officials and employees of the Mississippi State Tax Commission, the independent organizational experts, and medical experts testified that these law enforcement responsibilities and critical tasks are essential elements of the job of Scales Enforcement Officer and are reasonably necessary to the essence of the employer's business. Based on this evidence, defendants submit that they have met the first prong of the *Tamiami* test.

In analyzing this portion of the *Tamiami* test, plaintiff, in its Pre–Trial Memorandum of Law, takes the approach that in order to satisfy this element, the agency must require its members to participate in a regular physical fitness program. The recent case of *E.E.O.C. v. City of East Providence*, 798 F.2d 524 (1st Cir.1986), stated that "the failure to monitor physical standards ... is not necessarily inconsistent with recognizing that certain levels of strength, aerobic capacity, coronary fitness, etc., are necessary for effective police work." This issue was also addressed in *Missouri State Highway Patrol* where the Eighth Circuit stated as follows:

> The District Court also erroneously emphasized the fact that the Patrol does not require its members to participate in a regular physical fitness program. [*E.E. O.C. v. Missouri State Highway Patrol*, 555 F.Supp. 97 (W.D.Mo.1982)] *Id.* at 106. The Patrol showed that it would be impractical to force its members to participate in a regular program at a central location. It is inconvenient for members who travel or who are stationed in rural areas to come to a central location. Such a program also leaves some areas without Patrol protection. Moreover, the relevance of a physical fitness program to the issues in this case is questionable. The District Court's digression into this subject reflects concern with the subjective motivations for the Patrol's policies. The *Tamiami* test, however, focuses on objective evidence, particularly objective medical evidence, in support of the BFOQ. The test also does not evaluate the age restrictions in terms of an ideal employee. It simply requires objective evidence on whether the older employees can perform their duties or on whether there is a practical way to differentiate among employees other than age. As the Patrol suggests, "[t]he district court ... appears to base its decision invalidating the BFOQ on what it considers a 60 year old patrolman could be, if only 're-made' as the District Court sees fit." (Reply Brief for patrol at 2). The ADEA does not require so draconian an approach.

*E.E.O.C. v. Missouri State Highway Patrol*, 748 F.2d 447, 454 (8th Cir.1984), cert. denied 474 U.S. 828, 106 S.Ct. 88, 88 L.Ed. 2d 72 (1985).

The Eighth Circuit was confronted with evidence similar to that offered this Court in regard to the duties of Scales Enforcement Officers. This Court is in agreement with the Eighth Circuit's rationale where it states:

> The Patrol's obligations to the public mean that Patrol members of all ranks work the road, handle abusive and violent motorists, engage in high speed chases, assist motorists, and participate in other strenuous field work. Although a Patrol member may call for assistance, emergency situations do not always accord him the luxury of waiting for help. In light of these obligations and demands upon Patrol members, the Patrol has clearly established that physical ability and ability to withstand stress are job qualifications which are reasonably necessary to the performance of its functions, and that in these terms there is a correlation between the mandatory retirement age of sixty and the safe and efficient performance of the Patrol's functions. *Cf. Massachusetts Board of Retirement v. Murgia*, 427 U.S. 307 [96 S.Ct. 2562, 49 L.Ed.2d 520] (1976).

*E.E.O.C. v. Missouri State Highway Patrol*, 748 F.2d 447, 451 (8th Cir.1984), cert. denied 474 U.S. 828, 106 S.Ct. 88, 88 L.Ed. 2d 72 (1985).

The MSTC now demands of its employees in the Law Enforcement Division that violators who attempt to avoid compliance with the law must be dealt with immediately, safely, and efficiently, whether by warning, physical confrontation, or high speed pursuit in a vehicle. It is certainly reason-

able to assume that during the dispatch of these type duties a citizen could come dangerously close to the critical sphere of that activity. Therefore, the MSTC has taken into consideration the possibility of sudden heart failure, stroke, or other physical collapses which increase in probability with age, and also the possibility that one of these occurrences might coincide with the moment an officer determines to use his weapon or during the progress of a high speed chase. The likelihood need not be great since the MSTC needs only to show a minimal increase in risk of harm to life of one more person than might occur without the mandatory retirement policy. *Usery v. Tamiami Trail Tours, Inc.*, 531 F.2d 224, 234 (5th Cir.1976).

The United States District Court for the Northern District of Mississippi has already been confronted with analysis of the Scales Enforcement Officers positions in Cause No. GC82–132–WK–O (Jan. 1985), *Wayne F. Latham v. Mississippi State Tax Commission.* In making his determination as to the first prong of the *Tamiami* test, Judge Keady stated the following:

> Under the first prong of the *Tamiami* test, defendant claims that its mandatory retirement age of sixty-five for scales enforcement officers was reasonably necessary to the essence of the state's business, viz., the efficient enforcement of the state's tax laws respecting commercial vehicles. Defendant emphasizes that scales enforcement personnel are directed by statute to wear uniforms, bear arms, make arrests, and impound vehicles operated in violation of the law. *See,* Miss.Code Ann. § 27–5–75 (1972). Plaintiff urges that such personnel are primarily tax collectors having only incidental law enforcement duties and that they should not be regarded in the same light as police officers. We are not persuaded by plaintiff's argument. The inspecting and weighing of trucks, while done in part for revenue purposes, also protects the state's highway system against damage from overloaded vehicles. It is a job which cannot be viewed in isolation but must be considered in light of the work conditions at a weight station. The officer is called on

to make accurate and quick judgments and many times to perform arduous duties in requiring truck drivers to comply with law. As the evidence shows, the officer must be vigilant and able to respond quickly to unanticipated events, especially when encountering resistance from unruly or hostile individuals who may try to elude inspection or even threaten the officer's safety. The business of impounding trucks, citing and arresting operators, and in some cases having to pursue and subdue law violators are tasks more akin to law enforcement than to conventional tax collecting. The defendant has made a convincing showing that advanced age bears a negative relationship to the discharge of the essential work of a scales enforcement officer. In our opinion, this satisfies the first aspect of *Tamiami.*

In view of the evidence presented in the case *sub judice*, this Court finds that the MSTC has clearly established that physical stamina and the ability to withstand the stressful working conditions are essential to the safe and efficient execution of the duties of a Scales Enforcement Officer. The correlation between the aging process and the continuing ability to perform with minimum risks to public safety is also clearly established. Therefore, the MSTC has carried its burden with regard to the first prong of the test.

### C. Age Qualifications

The second prong of the *Tamiami* test to determine whether an age classification qualifies as a BFOQ requires that the employer have reasonable cause, that is, a factual basis, for believing either (1) that all or substantially all persons within the excluded class would be unable to perform the duties of the job safely and efficiently, or (2) that it is impossible or impractical to deal with persons over the age limit on an individualized basis. *Usery v. Tamiami Trail Tours, Inc.*, 531 F.2d 224 (5th Cir. 1976); *E.E.O.C. v. Missouri State Highway Patrol*, 748 F.2d 447 (8th Cir.1984).

The question as to whether all or substantially all Scales Enforcement Officers over the age of 60 would be physically and psychologically able to perform their job

safely and efficiently was addressed by each of the defendants' experts. These experts answered the question in the negative. These experts opined that the physical demands of lifting scales, wrestling violators, chasing suspects; the stress of confronting obnoxious, abusive drivers; the life-threatening activities of encountering armed violators and pursuing "scale-runners" at high speeds at night on lonely highways, all in an ever-present environment of impending hostility and danger were ill-suited for senior citizens.

This Court agrees and is reminded of Judge Keady's observations on the matter in *Latham* where he stated:

> Moreover, the weight of the evidence establishes that all, or substantially all, persons age sixty-five or older could not satisfactorily or safely perform all of the tasks required of the scales officer. While such persons might be able, like plaintiff, to perform clerical functions reasonably well, it would be generally and psychologically hazardous for them to engage in any of the strenuous activities which Scale Enforcement Officers are required to do. Defendant's experts have shown not only that the aging process generally diminishes an individual's physical and mental capabilities but that the critical job tasks, such as dealing with hostile individuals, making arrest, engaging in pursuit driving and in the use of firearms—as determined through the experience of incumbent officers and by job analysis cannot be done effectively by senior citizens. The court is satisfied from the proof that rigorous emotional and physical stress associated with performing these duties of the job adversely impacts upon the health of elderly persons, and justifies the mandatory retirement age that is challenged in this case.

Defendants' experts also agreed that it is impossible or impractical to deal with persons over the age limit on an individualized basis. The experts pointed to the inefficiency of testing, the lack of precise medical indicators, and even the dangers of some tests. For instance, although EEOC witnesses presented evidence that lifestyles, such as one's eating habits, whether one smoked or engaged in regular exercise would affect longevity, none of these witnesses could deny that the most accurate method for determining the presence of heart disease, the thallium stress test, carried with it a calculated risk of danger when performed. In sum, defendants' experts bemoaned the present state of the medical art to accurately distinguish between older officers who can and older officers who cannot perform safely and competently the rigorous and hazardous duties of Scales Officers.

EEOC has emphasized the sedentary and administrative aspects of the Scales Enforcement Officer's job and suggested that older employees could be relegated to the more sedentary aspects of the job, while younger workers would carry out the more rigorous aspects. However, the MSTC has shown that an efficient operation requires that all officers be able to perform all aspects of the job. The officers must be interchangeable within the organizational structure to ensure that the entire force may be relied upon when circumstances so require. This issue was discussed at length in the case of *Mahoney v. Trabucco*, 738 F.2d 35 (1st Cir.1984), cert. denied 469 U.S. 1036, 105 S.Ct. 513, 83 L.Ed.2d 403 (1984). The First Circuit upheld the age of 50 years for mandatory retirement of a State Police sergeant who had been assigned to an exclusively administrative position with no strenuous activity. The Court rejected a "particularistic" analysis of actual duties performed and looked instead to the requirements of the job and the distinct possibility that administrative personnel might be called upon in emergencies or reassigned to more arduous duties if necessary. The First Circuit concluded that the state was justified in establishing a mandatory retirement age of 50 years, regardless of whether some officers might be assigned to non-strenuous duties.

## CONCLUSION

This Court holds that MSTC clearly has justified its mandatory retirement age. The proof presented by EEOC which sought to characterize the Scales Officers' positions as sedentary and secure primarily addressed the positions when they were

**528**

under the MVCO. The MSTC now appears engaged in an effort to professionalize its officers and vigorously enforce the laws charged to its jurisdiction. The MSTC has shown that in holding to this undertaking, its officers, on frequent occasion, will be exposed to hazardous and life-threatening situations, situations which justify age as a bona fide occupational qualification.

Having concluded that the MSTC has met its burden in regard to both prongs of the *Tamiami* test, it is held that Miss.Code Ann. § 27–5–75 (Supp.1986) does not violate the provisions of the Age Discrimination in Employment Act.

IT IS, THEREFORE, ORDERED AND ADJUDGED that a judgment for the defendants, Mississippi State Tax Commission and the State of Mississippi, pursuant to this Memorandum Opinion, be entered in accordance with the local rules.